**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Dahlia Lockhart, | No. CV-20-00938-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| Techtronic Industries North America Incorporated, *et al.*, | |
| Defendants. | |

At issue is Defendants' Motion for Summary Judgment (Doc. 44, MSJ) accompanied by a Statement of Facts (Docs. 44-1 – 44-12, DSOF), to which Plaintiff filed a Response (Doc. 46, Resp.) accompanied by a Statement of Facts (Doc. 47, PSOF), and Defendants filed a Reply (Doc. 51, Reply). The Court will resolve the Motion without oral argument. LRCiv 7.2(f).

## I. BACKGROUND

Plaintiff Dahlia Lockhart alleges that, in approximately mid-2014, she purchased a leaf blower from Defendant Home Depot U.S.A., Inc., a company that markets and sells outdoor improvement products, among other things.[1] (Doc. 1, Compl. ¶¶ 5, 32; DSOF Ex. A, Lockhart Depo. at 61.) Plaintiff alleges that the leaf blower was designed, manufactured, marketed, distributed, sold, and/or placed into the stream of commerce by Defendants Techtronic Industries North America, Inc. ("TTI-NA"), Homelite Consumer

---

[1] The parties present no evidence showing that Plaintiff bought the leaf blower from Home Depot or which if any of Defendants were responsible for its design or manufacture, so the Court relies here on the parties' allegations in their pleadings, to the extent they provide this information.

1   Products, Inc. ("Homelite"), and One World Technologies, Inc. d/b/a Techtronic Industries
2   Power Equipment ("OWT")—all Delaware corporations—and Techtronic Industries Co.
3   Ltd. ("TTI-HK")—a Chinese corporation.[2] (Compl. ¶¶ 3, 8–11.)

4       Plaintiff alleges that, on May 29, 2018, she was operating the leaf blower "during
5   normal landscaping use" and "the material covering the Subject Leaf Blower's impeller [or
6   fan] failed," causing severe and permanent injuries to her hand. (Compl. ¶ 29.) She raises
7   ten counts against Defendants, as follows: (1) strict products liability against TTI-NA; (2)
8   negligence against TTI-NA; (3) strict products liability against TTI-HK; (4) negligence
9   against TTI-HK; (5) strict products liability against Homelite; (6) negligence against
10  Homelite; (7) strict products liability against OWT; (8) negligence against OWT; (9) strict
11  products liability against Home Depot; and (10) negligence against Home Depot. After
12  filing the Complaint, Plaintiff voluntarily dismissed her claims against TTI-HK, so Counts
13  3 and 4 are dismissed. (Doc. 13.) Defendants now move for summary judgment on all the
14  claims against them.

15  **II.    LEGAL STANDARD**

16      Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate
17  when the movant shows that there is no genuine dispute as to any material fact and the
18  movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v.*
19  *Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is 'material' only if it might affect the
20  outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could
21  resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA,*
22  *LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
23  242, 248 (1986)). The court must view the evidence in the light most favorable to the
24  nonmoving party and draw all reasonable inferences in the nonmoving party's favor.
25  *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

26

27  ―――――――――――――
    [2] In its Answer, OWT alleges it is a wholly owned subsidiary of TTI-NA and denies that it
28  manufactured or distributed the blower. (Doc. 16, OWT Answer ¶ 4.) Likewise, in its
    Answer, Homelite alleges it is a wholly owned subsidiary of TTI-NA. (Doc. 18, Homelite
    Answer ¶ 4.)

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 232. When the moving party does not bear the ultimate burden of proof, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party carries this initial burden of production, the nonmoving party must produce evidence to support its claim or defense. *Id*. at 1103. Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence, as long as it is supported by affidavits or other evidentiary material. *Anderson*, 477 U.S. at 255. However, the non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Id.* at 256–57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." (citation omitted)).

## III.   ANALYSIS

Plaintiff brings strict products liability and negligence claims against the remaining Defendants. District courts apply state law to products liability claims brought in federal court pursuant to diversity jurisdiction. *Adams v. Synthes Spine Co.*, 298 F.3d 1114, 1117 (9th Cir. 2002). Arizona courts draw a distinction between strict liability claims and negligence claims by way of the focus of the inquiry and the time frame in which it is made. *Dart v. Wiebe Mfg., Inc.*, 709 P.2d 876, 880–81 (Ariz. 1985). Specifically, "[n]egligence

theory concerns itself with determining whether the *conduct of the defendant* was reasonable in view of the foreseeable risk of injury; strict liability is concerned with whether the *product itself* was unreasonably dangerous." *Id.* at 880 (emphasis added). Thus, "[f]or a plaintiff to prove negligence he must prove that the designer or manufacturer acted unreasonably at the time of manufacture or design of the product." *Id.* at 881. In a strict liability analysis, however, "[t]he quality of the product may be measured not only by the information available to the manufacturer at the time of design, but also by the information available to the trier of fact at the time of trial." *Id.*

### A.    Strict Products Liability

"Although the doctrine of strict liability in tort imposes liability without proof of negligence, the law does not impose liability for every injury caused by a product." *Id.* at 878. "Liability exists only if the product was in a 'defective condition unreasonably dangerous,'" defined as a "'condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.'" *Id.* (quoting Restatement (Second) of Torts § 402A & cmt. g.) To establish a *prima facie* case of strict liability, a plaintiff must show: (1) the product was in a defective condition when it left the defendant's control; (2) the defective condition made the product unreasonably dangerous; and (3) the defect caused plaintiff's injuries. *Jimenez v. Sears, Roebuck & Co.*, 904 P.2d 861, 864 (Ariz. 1995).

The Arizona Supreme Court has identified two tests that may be used to examine the existence of an unreasonably dangerous defective condition: (1) the consumer expectation test, and (2) the risk/benefit analysis. *Dart*, 709 P.2d at 879. The consumer expectation test may be applied where an ordinary consumer has experience with the product and thus has a reasonable expectation of how safely it should perform. *See id.* at 878–79. The risk/benefit analysis generally applies where an ordinary consumer lacks experience with the product, and thus lacks a reasonable expectation as to its "safe" performance. *See id.*

Here, Plaintiff raises two species of strict products liability: design defect and manufacturing defect.

### 1. Design Defect

All parties agree that the risk/benefit analysis applies in the determination of whether the leaf blower had an unreasonably dangerous defective design. (MSJ at 6–7; Resp. at 5.) Indeed, as Defendants point out, the Arizona Supreme Court has stated that "[d]espite its virtues in the manufacturing defect setting, the consumer expectation test fails to provide an adequate legal standard in design defect cases." *Dart*, 709 P.2d at 878. This is true in part because, "[w]hile manufacturing flaws can be evaluated against the intended design of the product, no such objective standard exists in the design defect context." *Id.* (quoting *Caterpillar Tractor Co. v. Beck*, 593 P.2d 871, 880 (Alaska 1979)).

Evaluating risk/benefit is a multi-factor analysis in which a court should consider:

> (1) The usefulness and desirability of the product,
> (2) the availability of other and safer products to meet the same need,
> (3) the likelihood of injury and its probable seriousness,
> (4) the obviousness of the danger,
> (5) common knowledge and normal public expectation of the danger (particularly for established products),
> (6) the avoidability of injury by care in use of the product (including the effect of instructions and warnings), and
> (7) the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive.

*Id.* at 879–80 (quoting *Byrns v. Riddell, Inc.*, 550 P.2d 1065, 1068 (Ariz. 1976)).

The starting point of any strict products liability analysis is the identification of a product defect. Defendants argue that Plaintiff has not proffered sufficient evidence from which a reasonable jury could conclude the leaf blower was defective, pointing in particular to Plaintiff's testimony that she does not know if the blower's fan guard was broken before the incident or broke at the time of the incident and that she did not place any pressure with her hand on the fan guard. (MSJ at 7.) Defendants also proffer evidence going to wear and tear on the leaf blower, including that Plaintiff reported using the leaf blower "roughly twice per week on average from the time of purchase through the time she was injured on May 29, 2018."[3] (DSOF Ex. F, Smith Report at 3.)

---

[3] At different points, Plaintiff reported purchasing the leaf blower in June 2010 and in mid-2014; at her deposition, Plaintiff testified she "would be guessing," but the mid-2014 date

For her part, Plaintiff relies on the testimony of her expert, Cynthia Smith, who found that "[t]he incident blower housing exhibited widespread fine cracking, including in the area of the incident impeller guard," and the cracks "were consistent with environmental stress cracking and/or thermo-oxidative degradation." (Smith Report at 33.) "For environmental stress cracking to occur, three things must exist simultaneously: a susceptible polymer, an incompatible chemical agent, and tensile stress." (Smith Report at 33.) Smith stated that results of material testing on the housing "were consistent with ABS polymer, which is known to be susceptible to environmental stress cracking." (Smith Report at 33.) She also found that "[p]olydimethyl siloxane (PDMS) and esters of fatty acids were detected on the incident fractures," which "are sometimes used as mold release agents" and "are known in published literature to cause environmental stress cracking in susceptible polymers including ABS and chemically similar materials." (Smith Report at 33–34.) Based on these findings, Plaintiff argues that a genuine issue of fact exists as to whether the fan guard was defective by way of the materials specified, and the Court agrees.

The inquiry does not end there; rather, Plaintiff must also demonstrate the alleged defect was unreasonably dangerous, here by way of the risk/benefit analysis. *See Dart*, 709 P.2d at 878–79 & n.1 (distinguishing strict products liability from absolute liability and stating that the "unreasonably dangerous" prong of the test is essential to ensure that a factfinder does not simply find liability for every injury caused by a product); *Readenour v. Marion Power Shovel*, 719 P.2d 1058, 1063 (Ariz. 1986) ("A defective condition is one which makes the product unsafe for normal handling and consumption," but "the defective condition alone . . . will not create liability;" "[s]trict liability in tort is found only where the defective condition causes the product to be unreasonably dangerous." (internal quotations and citations omitted)).

Defendants argue that Plaintiff has not produced any evidence addressing any of the risk/benefit factors. (MSJ at 9.) Indeed, in her response, Plaintiff only points to the Smith

"would be more accurate." (Lockhart Depo. at 61.)

report, but it contains no probative statements regarding any of the factors, such as whether other, safer products are available to meet the same need, the likelihood of injury (and its probable seriousness) arising from the alleged defect, or the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive. Plaintiff is incorrect when she argues "[a] jury could reasonably assess that the decision to use [PDMS], as opposed to another release agent, was negligent and created an unnecessary risk of harm" (Resp. at 7), when Plaintiff has produced no evidence of, for example, another possible release agent to which a jury could compare the use of PDMS. Without any risk/benefit evidence, no reasonable jury could find that the alleged defect in the leaf blower's fan guard was unreasonably dangerous. As a result, Defendants are entitled to summary judgment on Plaintiff's design defect claims.

### 2.    Manufacturing Defect

The parties posit that the consumer expectation test applies to Plaintiff's manufacturing defect claims. The consumer expectation test is grounded in a "legal standard by which to measure the concept of 'defect'" as a condition in which "the product contains a danger which the manufacturer did not intend and the customer did not expect." *Dart*, 709 P.2d at 878 (noting that "the consumer expectation test arises from and expresses principles of implied warranty, the predecessor of strict liability in tort" (internal quotation and citation omitted)); *see also* Restatement (Second) of Torts § 402A, cmt. g (a product is unreasonably dangerous when it is "in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him"); *id.* cmt. i ("The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."). Thus, a plaintiff may be able to demonstrate a manufacturing defect by evidence that "the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonable manner." *Id.* at 879 (quoting *Barker v. Lull Eng'g Co.*, 573 P.2d 443 (Cal. 1978)).

The issue at summary judgment is whether Plaintiff has produced sufficient evidence from which a reasonable jury could find the leaf blower had a manufacturing defect, which necessarily involves the threshold question of what evidence is required to prove that claim. Although the Arizona Supreme Court stated in *Dart* that the consumer expectation test may be appropriate in resolving manufacturing defect claims, that Court was not asked—in that or any other case—to resolve a manufacturing defect claim or determine what evidence would be required to prove such a claim. Indeed, while a number of courts in Arizona have applied the consumer expectation test in *design* defect cases for products such as ladders and baby seats in which a consumer has formed an expectation as to how safely the product is designed, few Arizona courts have addressed the evidence required to prove a *manufacturing* defect claim. *Feuerstein v. Home Depot U.S.A., Inc.*, No. 2:12-CV-01062 JWS, 2014 WL 2557122, at *4 (D. Ariz. June 6, 2014) (addressing design defect claim involving articulating ladder); *Brethauer v. Gen. Motors Corp.*, 211 P.3d 1176, 1183 (Ariz. Ct. App. 2009) (addressing design defect claim involving baby seat).

The proof required to show a manufacturing defect logically depends on the defect alleged. *See* David G. Owen, *Manufacturing Defects*, 53 S.C. L. Rev. 851, 863–66 (2002) (noting that courts have been unable to define a single test for the broad range of manufacturing defect cases). In certain instances, the task of ascertaining a manufacturing defect based on consumer expectations is well suited to a factfinder based simply on the factfinder's knowledge or common sense, as for example where a bottle of Coca-Cola contains slivers of glass. *See Peryea v. Coca-Cola Bottling Co. of New England*, 286 A.2d 877, 878 (R.I. 1972). There, it is clear without further evidence that "the product contains a danger which the manufacturer did not intend and the customer did not expect." *Dart*, 709 P.2d at 878. In other instances, a factfinder cannot make the determination based on common sense, but rather evidence is required from which the factfinder can assess whether a product has a manufacturing defect, as for example where dog food was made with wheat containing a potentially dangerous level of a toxin. *See Sw. Pet Food Prods., Inc. v. Koch Indus., Inc.*, 273 F. Supp. 2d 1041, 1058 (D. Ariz. 2003).

- 8 -

1      Here, in contending that the manufacturing defect inquiry is whether "the guard on

2  the Subject Blower perform[ed] as safely as an ordinary customer would expect when used

3  in an intended or reasonable manner" (Resp. at 8), Plaintiff implies that a jury can make

4  the manufacturing defect determination without any evidence beyond the alleged fact of

5  the guard failure itself. Indeed, Plaintiff has proffered no evidence beyond her own

6  testimony of the incident and the expert report describing how the guard might have failed.[4]

7      The inquiry is less straightforward than Plaintiff proposes. Plaintiff's testimony

8  reveals that she used the leaf blower approximately two times a week for at least four years

9  without incident. A factfinder must thus assess whether failure of the guard after 400 uses

10  in the Arizona conditions Plaintiff used the leaf blower was due to defective manufacture

11  of the leaf blower. The Court does not find such an inquiry to be based on common sense,

12  but rather a factfinder must have evidence on which to base his/her assessment.[5]

13      Such evidence could include, for example, data on how long comparable leaf

14  blowers last without experiencing the alleged failure. Indeed, in *Brady v. Melody Homes*

15  *Manufacturer*, the Arizona Court of Appeals stated that "the proof as to the existence of

16  the defect in the manufacturing defect cases is relatively straightforward, usually by

17  comparison of the injury-producing product with other non-defective products in the same

18  line." 589 P.2d 896, 899 (Ariz. Ct. App. 1978), *disapproved of on other grounds by Dart*,

19  709 P.2d at 276.

20      Or Plaintiff could produce any evidence showing the product did not perform as

21  intended. *See* Owen, *Manufacturing Defects*, 53 S.C. L. Rev. at 865–71. In concluding that

22

23  [4] Indeed, Plaintiff proffers no evidence at all with her Statement of Facts in response to
   Defendant's Motion for Summary Judgment, referring only to Defendant's proffered

24  evidence of Plaintiff's expert report and deposition excerpts as well as a few excerpts from
   Plaintiff's deposition. (*See* PSOF.)

25  [5] In instances such as this one, the consumer expectations test could call for speculation to

26  such a degree that it could morph into a consumer aspirations test. Consumers would of
   course like for the products they buy to last forever. But a consumer's uninformed guess

27  as to how long a product should last in various conditions does not correlate to a
   determination of whether the product performed in the way, or for as long, as it was
   designed to perform—the critical determination in resolving a manufacturing defect claim.

28  Put another way, a failure may arise from wear and tear on the product beyond that for
   which the product was designed.

the consumer expectations test may be used in manufacturing defect cases, the Arizona Supreme Court referred with approval to the proposition that "manufacturing flaws can be evaluated against the intended design of the product." *Dart*, 709 P.2d at 878 (quoting *Caterpillar*, 593 P.2d at 880). The Ninth Circuit, in addressing both strict products liability and negligence claims under Arizona law in *Stilwell v. Smith & Nephew, Inc.*, affirmed a district court's order granting summary judgment for the manufacturer of a nail implanted in the plaintiff's femur which failed after a certain period of time, because the plaintiff did not provide any evidence of the "intended duration" of the nail's use, which the plaintiff "conceded was not indefinite." 482 F.3d 1187, 1194 (9th Cir. 2007). Although the plaintiff suggested that the product "should have performed longer than it did," "she did not rely on any record evidence to support that contention." *Id.* at 1195. The court noted that even though physicians testified that failure of the product was rare, "rarity does not indicate infallibility." *Id.* Without evidence that the product did not perform as intended, the plaintiff failed to show a genuine issue of fact to avoid summary judgment. *Id.*

Because Plaintiff has provided no evidence from which a reasonable jury could conclude that, considering the years and conditions of its prior use, the leaf blower's fan guard failed as a result of a manufacturing defect, Defendants are entitled to summary judgment on Plaintiff's manufacturing defect claims.

### B.      Negligence

Under Arizona law, "for a plaintiff to prove negligence he must prove that the designer or manufacturer acted unreasonably at the time of manufacture or design of the product. This test is nothing more than the familiar negligence standard." *Dart*, 709 P.2d at 881 (internal quotations omitted). In evaluating a negligence claim, evidence of a defect alone is not sufficient; there must also be evidence of unreasonable conduct on the part of the defendant. *See Phila. Indem. Ins. Co. v. BMW of N. Am., LLC*, No. CV-13-01228-PHX-JZB, 2015 WL 5693525, at *16 (D. Ariz. Sept. 29, 2015).

Plaintiff points to no evidence of Defendants' conduct at the time of the leaf blower's design or manufacture. Plaintiff argues first that the Court should apply the

risk/benefit analysis to her negligence claim, but that analysis is to be applied to strict liability claims, *Dart*, 709 P.2d at 879–80, and in any event the Court found above that Plaintiff produced no evidence with which to conduct a risk/benefit analysis.

Plaintiff next argues that, in response to her request for production of documents related to the design and manufacture of the subject leaf blower, Defendants provided "some of the requested information but not all." (Resp. at 13.) Plaintiff thus states she has no way to show Defendants' negligence, but a determination by the Court that Defendants are entitled to summary judgment "would be unjust." (Resp. at 13.)

As the Court stated in its Order sanctioning Plaintiff for failing to timely make disclosures in this case (Doc. 53), the Court entered the original Scheduling Order in this matter on October 8, 2020, setting a discovery deadline of April 22, 2022, and setting forth a procedure by which parties were to raise any discovery disputes to the Court—including failure of a party to respond to a request for production of documents. (Doc. 24.) Plaintiff filed two Consent Motions to extend the Scheduling Order deadlines (Docs. 30, 33), both of which the Court granted (Docs. 31, 34). The parties then filed a Joint Motion to further extend the deadlines (Doc. 38), which the Court also granted (Doc. 39). The ultimate discovery deadline was September 23, 2022. (Doc. 39.) At no point in the two years the parties had to conduct discovery did Plaintiff ever notify the Court of a discovery dispute or that she had not obtained the documents she requested from Defendants. Plaintiff's statement regarding Defendants' alleged lack of production in her Response to Defendants' Motion for Summary Judgment—two months after the close of discovery—is untimely and demonstrates an extraordinary lack of diligence on the part of Plaintiff's counsel, the same lack of diligence that resulted in a sanction against Plaintiff for failing to timely make disclosures in this case. (Docs. 53, 57, 62.)

Because Plaintiff has proffered no evidence of Defendants' conduct at the time of the leaf blower's design or manufacture from which a reasonable jury could find Defendants negligent, the Court will grant summary judgment to Defendants on Plaintiff's negligence claims.

Plaintiff also brings a failure to warn claim under her negligence causes of action. (*E.g.*, Compl. Count 2, Negligence claim against TTI-NA.) Under Arizona law, a manufacturer has a duty to warn of dangers inherent in the intended or reasonably foreseeable use of a product. *Kavanaugh v. Kavanaugh*, 641 P.2d 258, 262 (Ariz. Ct. App. 1981). To succeed in an informational defect claim, a plaintiff must prove "that the defendant did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution." *Powers v. Taser Int'l, Inc.*, 174 P.3d 777, 783 (Ariz. Ct. App. 2007) (quotation omitted). A seller is charged "'with knowledge of what reasonable testing would reveal.'" *Id.* at 784 (quoting Restatement (Third) of Torts: Products Liability § 2 cmt. m). But where the danger is obvious or known to the user, liability will not lie. *Raschke v. Carrier Corp.*, 703 P.2d 556, 559 (Ariz. Ct. App. 1985). Unlike manufacturing or design defect claims, an informational defect claim "relates to a failure extraneous to the product itself." *Powers*, 174 P.3d at 783. An informational defect claim is thus "rooted in negligence to a greater extent than manufacturing or design defect theories," because it concerns the manufacturer's conduct in a way that the other two theories do not. *Id.* (quotation omitted).

As with Plaintiff's other claims, her failure to warn claim suffers from a failure of evidence. In particular, Plaintiff points to no evidence that the alleged risk with the leaf blower—failure of the fan guard considering the years and conditions of its prior use—was "known or knowable" by Defendants. As a result, Defendants are also entitled to summary judgment on Plaintiff's failure to warn claims.

## C.    Damages

The Court agrees with Defendants (MSJ at 14–16) that many of the species of damages Plaintiff sought are precluded by the fact that she never disclosed expert testimony going to those damages, such as expert medical opinions addressing the ongoing or permanent nature of her injuries. (*See* Doc. 53.) But because the Court will grant summary

judgment to Defendants on all of Plaintiff's claims against them, it need not reach Defendants' damages arguments.

**IT IS THEREFORE ORDERED** granting Defendants' Motion for Summary Judgment (Doc. 44).

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment in favor of Defendants on all of Plaintiff's claims against them and stating that Plaintiff shall pay Defendants $9,600.00 (Doc. 62).

**IT IS FURTHER ORDERED** that the Clerk of Court shall close this matter.

Dated this 12th day of May, 2023.

_____

Honorable John J. Tuchi
United States District Judge